THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FRANCISCO BONILLA MEDINA, Defendant and Appellant.

No. CR-68-21.     Decided June 8, 1970.

*Benjamín Ortiz* for appellant. *Rafael A. Rivera Cruz, Solicitor General,* and *Adolfo Negrón Cruz, Assistant Solicitor General,* for The People.

### JUDGMENT

Appellant was found guilty of two violations of the Weapons Law, consisting in carrying an unloaded 22 caliber

revolver, without having a license to carry weapons and in having in his possession the same weapon without having a license to possess firearms. He was sentenced to serve seven months in jail, concurrently, on both counts.

The evidence of the people through the only witness for the prosecution, the policeman who intervened with appellant, is in the sense that while the latter's luggage—which consisted of two paper bags, the kind known as shopping bags and a package—was being inspected by a customhouse inspector at the airport (appellant was going on a trip) they found in a package, or in the jacket, or in the coat, an unloaded 22 caliber revolver. Appellant testified that he placed his bundles on a bench facing departure gate No. 8, and went to the rest room; that when he returned he gathered his belongings and placed them on the customhouse inspector's table and the latter took out the revolver and called the policeman and then he placed the revolver inside the pocket of appellant's coat and gave the coat with the revolver to the policeman. He testified that the revolver was not his and that he was not carrying it.

The evidence for the prosecution is extremely confusing. The policeman testified first that the customhouse inspector told him, "Look, Rodríguez, that man is carrying a revolver and I searched the package and took out the revolver." Further on he testified that appellant had the revolver "in the pockets." He testified that the customhouse inspector was inspecting the packages; that the revolver was "in the package of the jacket, not in the coat"; he testified, "I put my hand inside and I took it out." The policeman testified that it was a "Colt" revolver and also that it was a "Brevetatta" [sic] of Italian make. (He probably meant "Beretta," which is an Italian brand of firearms.)

We do not think that a so confusing evidence can destroy defendant's presumption of innocence, or that it is sufficient to send him to jail for seven months.

The judgment rendered in this case by the Superior Court, San Juan Part, on September 8, 1967, is reversed.

It was so decreed and ordered by the Court and certified by the Clerk. Mr. Justice Pérez Pimentel and Mr. Justice Santana Becerra dissented.

(s) JOAQUÍN BERRÍOS

*Clerk*

—O—

MR. JUSTICE PÉREZ PIMENTEL, dissenting.

San Juan, Puerto Rico, June 8, 1970

After reading the transcript of evidence, I am compelled to dissent.

The apparent confusion in the policeman's testimony is dissipated when his testimony is considered as a whole. When the policeman mentions that appellant carried the revolver in his pockets, he obviously refers to the pockets of the garment which appellant carried inside the package. It was from there that the policeman took out the revolver when the custom-house agent told him that "this gentleman is carrying something here." The policeman did not say that the revolver was a Colt and later corrected himself to say that it was a Brevetatta. What he said was: "A Colt 22 Brevetatta revolver, Italian make."

The revolver was introduced and admitted in evidence. It was seized from appellant's package. His own testimony corroborates that fact. Let us hear appellant.

"A.—On April 4, at the airport at 3:00 o'clock in the afternoon, I had a package and a jacket in front of gate 8 and I was with my daughter, I was going to take her, and then when I returned the departure had already been given and I picked up the packages and went on immediately and pushed her forward. When I reached customs I placed the packages which I had

on the table and I carried the coat and the jacket here and he told me. . . .

Q.—Who told you?

A.—The man in customs, that what was that in there, a search has to be made. He came and searched and took out a revolver. I do not know to whom that did belong, because I never carry one, and then he took out the revolver in this manner and called the policeman.

Q.—When the policeman arrived, where was that revolver?

A.—He had the revolver in his hand.

Q.—That is, the policeman arrived after the officer had it in his hand?

A.—Afterwards, and when he arrived he put it in the pocket.

Q.—Who put it in the pocket?

A.—The man at customs and then he gave the coat to the policeman.

Q.—When the policeman arrived, did he have it in his hand?

A.—He had already searched everything.

Q.—Did he search when he asked you to throw everything there?

A.—He told me to throw it there, that they wanted to search it.

Q.—Was it there?

A.—It was there.

Q.—Where had you left that jacket and that coat?

A.—On the bench facing gate 8.

Q.—Why?

A.—Because I was carrying packages and it was impossible for me to carry it and I went to the bathroom and it was more comfortable and I left it thereon.

Q.—Had you placed that revolver in that jacket?

A.—I do not know what revolver you are talking about. I am not used to carrying anything with me." (Tr. Ev. pp. 17 to 19.)

The conflict in the evidence about whether appellant carried the revolver in his package, or whether it was someone who put it there without his knowledge, was decided against him by the trier of the facts and there is no ground to revoke his determination.

Now then, I consider that the court should have given defendant an opportunity to introduce as witness for the defense, as he requested, the customhouse inspector who intervened in the search of his belongings. That witness was summoned as a witness for the prosecution at the request of the prosecuting attorney, but he did not appear at the trial. The defendant insisted on having him summoned to testify as witness for the defense. I consider that the court should have consented thereto, for which reason I would reverse the judgment appealed from and would order a new trial.

—O—

MR. JUSTICE SANTANA BECERRA, dissenting.

San Juan, Puerto Rico, June 8, 1970

I agree with the dissenting opinion of colleague Pérez Pimentel. The direct evidence for the prosecution, as it appears from the brief stenographic record, is the following:

*"Sworn Statement of*
*Wilfredo Rodríguez Martínez*

PROSECUTING ATTORNEY:
   Q.—Your name, please?
   A.—Wilfredo Rodríguez Martínez.
   Q.—On or about April 4, 1967, in what were you engaged?
   A.—I was a policeman and worked at the International Airport.
   Q.—State Police?
   A.—Yes.
JUDGE:
   Where did you work?
   A.—International Airport.
PROSECUTING ATTORNEY:
   Q.—On that day, April 4, 1967, were you working about 3:00 o'clock in the afternoon?
   A.—Yes, sir.

130

Q.—As a policeman?

A.—Yes, sir.

Q.—Where?

A.—International Airport, waiting room.

Q.—Did you have the opportunity on that day to see Francisco Bonilla Medina?

A.—Yes, sir.

Q.—Is that citizen here?

A.—Yes, sir.

Q.—Where is he?

A.—He is there.

PROSECUTING ATTORNEY:

He points out defendant.

Q.—Did you intervene with that citizen on that day?

A.—Yes, sir.

Q.—Explain to the judge which was your intervention.

A.—The intervention took place after he was going through the customs inspection, of Rafael Bird, customhouse officer, while he was inspecting, he carried only one package. . . .

MR. ORTIZ:

Objection to what he has not personally seen.

JUDGE:

Did you see that?

A.—Yes, sir.

JUDGE:

Go on.

A.—I was next to the customhouse officer who was inspecting those packages and he told me: 'Look, Rodríguez, that man is carrying a revolver' and I searched the package and took out the revolver.

Q.—What kind of a revolver?

A.—A Colt 22 Beretta, Italian make.

Q.—How was that revolver?

A.—A small caliber 22 revolver, white trimmed, it does not have a serial number.

PROSECUTING ATTORNEY:

We are showing the colleague.

MR. ORTIZ:

Very well.

PROSECUTING ATTORNEY:

Q.—Witness, see if you recognize what I am showing you.

A.—This is the revolver.

Q.—Had you seen what I am showing you before today?

A.—Yes, sir.

Q.—When was the first time that you saw it?

A.—On April 4.

Q.—On what occasion, where did you see it?

A.—After the customhouse officer told me that he was carrying a revolver in the pocket.

MR. ORTIZ:

Objection to what the customhouse officer would have said.

PROSECUTING ATTORNEY:

To establish the motive or reason.

MR. ORTIZ:

But not as hearsay evidence.

JUDGE:

There is a statement of the customhouse officer, on account of which this man immediately intervened with this defendant. That also forms part of the 'res gestae.' It is permitted as part of the 'res gestae.'

PROSECUTING ATTORNEY:

Q.—In whose possession was the revolver?

A.—In the possession of defendant, he had it in his pockets.

PROSECUTING ATTORNEY:

Let it be marked for identification, Your Honor.

JUDGE:

It is marked Exhibit No. 1 of The People.

PROSECUTING ATTORNEY:

Q.—Witness, what did you do then, if you did anything, after you seized the weapon?

A.—I waited until the customhouse officer finished checking the packages and took him to the police station.

Q.—And after that?

A.—I informed the sergeant and the sergeant told me to take the case before the judge.

Q.—And where did that occur, witness, in what place in the airport?

A.—Going out of gate No. 8 in the airport, before going down the stairs where the customhouse officers inspect the packages.

Q.—In the jurisdiction of what town?

A.—The airport belongs to Carolina.

*That is all.*

JUDGE.

Defense.

MR. ORTIZ:

Q.—Did you testify before the prosecuting attorney?

PROSECUTING ATTORNEY:

We are delivering to the colleague a copy of the sworn statement he made on May 9, 1967, before prosecuting attorney Lilia Oquendo.

JUDGE:

The defense may examine it.

MR. ORTIZ:

Q.—Who is that customhouse officer?

A.—Rafael Bird, he is not present.

Q.—Is he here today?

A.—No, sir.

Q.—Tell me, and where were you in the airport?

A.—At gate No. 8.

Q.—How was the gate; where is customs?

A.—Customs is on the other side, but when a flight is to depart a customhouse officer has to go to inspect the packages which they carry, no.

Q.—Then, there was one there?

A.—Yes.

Q.—At what distance were you from that customhouse officer?

A.—Three feet away.

Q.—What packages was this man Bonilla carrying?

A.—He was carrying two packages of those called shopping bags and cost five cents.

Q.—Wasn't he carrying a coat?

A.—He had a package on his arm and a coat.

Q.—Did you see him when he went in there; when did you see him?

A.—Yes.

Q.—Had you seen him before, before the customhouse officer called your attention?

A.—He went to the Pan American officer to check the ticket.

Q.—You had seen him?

A.—After he came from checking the ticket, yes.

Q.—You saw him with the coat in the hand; you did not notice anything before the customhouse officer called you, you had not noticed anything?

A.—No, sir.

Q.—You had not seen the revolver?

A.—No, sir.

Q.—You could not see the revolver in the coat on him.

A.—No, sir.

Q.—And the one who found out was the customhouse officer?

A.—Yes, sir, the first search was made by the customhouse officer.

Q.—How?

A.—The customhouse officer was searching the packages.

Q.—Did you search the coat?

A.—The customhouse officer, while searching it underneath, touched the revolver.

Q.—Did you see him when he touched the revolver, when he touched the coat?

A.—He touched something and said 'this man is carrying something here.'

Q.—Nothing was seen from the outside?

A.—No, sir.

Q.—The one who made the search of the coat was the officer?

A.—The revolver was in the package of the jacket, not in the coat.

Q.—Who searched him, the officer?

A.—After he touched it and told me that he was carrying a revolver, I put my hand inside and took it out.

Q.—And you had not seen that revolver before?

A.—No, sir.

Q.—Witness, this is your signature, read that statement.

JUDGE:

Read it to yourself.

MR. ORTIZ:

Q.—Is it true or not that you testified herein that the search was made by the customhouse agent?

A.—The search that the customhouse agent was making.

Q.—He is the one who searched?

A.—He was the one who was making the search.

Q.—The searching of the passenger, Rafael Bird?

A.—He was the one who was making the search, but I took out the revolver.

Q.—And why does it say here that the customhouse agent made the search?

A.—The inspection of the packages.

Q.—In any event, until the customhouse agent called your attention, you had not noticed anything?

A.—No, sir.

Q.—You had seen him before in the line and the rest?

A.—. . . .

Q.—Is it true or not that the officer called you with the revolver in his hand and that you did not search anything there?

A.—No, sir.

*Nothing more with the witness."*

I likewise agree with colleague Pérez Pimentel that defendant's testimony, which he copies in his opinion, tends to corroborate the essential fact of the seizure of the revolver. In my opinion, the evidence for the prosecution was sufficiently clear to establish the commission of the offense charged.

But even though it would not have been so, it is precisely the function par excellence of the trier in first instance to settle contradictions and conflicts in the evidence, in his mission of weighing and evaluating the evidence with the help of other objective elements which do not appear in a record.

Consistent with my position, sometimes with an expression of my view—see, among others, my minority opinions in *People* v. *Soto Zaragoza,* 94 P.R.R. 332 (1967); *People* v. *Bermúdez Pérez,* 94 P.R.R. 345 (1967), and the one in *People*

v. *Berdecía Rodríguez,* concurring in the outcome, decided May 16, 1968 (96 P.R.R. 64, 73)—and other times without said expression, I continue objecting the transfer to this second instance, case by case, of the function of the credibility, weighing and evaluation of the evidence. I reaffirm myself in that it is not a healthy policy in the administration of justice for the reasons I have previously set forth.

The hazard exists, since the second instance is a collegiate court and judgment concerning this clearly subjective aspect is rendered on the basis of the record that there might be lacking the desirable uniformity in the disposal of the cases on appeal, in view of the absence, at the same time, of another clear and definite rule of law as to in which case is the classical view of not intervening in this function reserved to the trier in first instance should be followed, and in which case not.

I am not referring to a situation of insufficiency at law of competent evidence to convict, which represents an error of law of our clear competence, nor to the case of an evidence merely unreal or contrary to the natural and established order of things. The case now under consideration does not fall within that level.

A fundamental error was committed by the court in refusing to summon and hear the customhouse officer, as was requested by appellant.

In view of the foregoing, I agree that this case should be disposed of, as Mr. Justice Pérez Pimentel states in his dissenting opinion, by granting a new trial.